LACQUINITA DONNELLY, )
)
           Plaintiff, )
)
        v. )          No. 4:08-CV-347 CAS
)
ST. JOHN'S MERCY MEDICAL CENTER, )
et al., )
)
          Defendants. )

## MEMORANDUM AND ORDER

This is an action by a pro se plaintiff, Lacquinita Donnelly, against her employer, St. John's Mercy Medical Center ("St. John's"), under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.§§ 12101, et seq. ("ADA"). The complaint alleges that in December 2006 plaintiff was assigned to an area of the hospital which was under construction. Plaintiff alleges that her assignment near the construction area caused her "illness to exacerbate, leading to increase[d] absenteeism," and she requested the reasonable accommodation of an assignment away from the construction area, but the accommodation was denied until March 24, 2007.

This case is before the Court on defendant St. John's motion for summary judgment. Plaintiff opposes the motion and it is fully briefed. For the following reasons, the Court will grant the motion for summary judgment. Also pending is plaintiff's Memorandum for Clerk, which the Court will construe as a motion to compel and that will be denied.

**Legal Standard**

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v.

Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. See Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006).

**Facts**[1]

---

[1]The Court adopts in its entirety St. John's Statement of Undisputed Facts, which is supported by St. John's citations to the record. Plaintiff failed to comply with Local Rule 4.01(E), which require a party opposing a motion for summary judgment to respond to the moving party's statement of facts in a specified manner:

> Every memorandum in opposition [to a motion for summary judgment] shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E. D. Mo. Local Rule 4.01(E). See Ridpath v. Pederson, 407 F.3d 934, 936 (8th Cir. 2005) (where plaintiff did not controvert defendant's statement of material fact, it was deemed admitted under Rule 4.01(E)). Plaintiff did not directly respond to St. John's statement of the facts, and did not note the paragraph numbers from movant's listing of facts. Instead, plaintiff submitted an unverified fourteen page narrative of her claims in which she simply attempts to refute the allegations contained in defendant's motion for summary judgment, with some citations to the record in footnotes. Some of plaintiff's statements in her narrative contradict her deposition testimony and other statements lack any citation to the record.                                                                                  .

"The purpose of the rule is to distill to a manageable volume the matters that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial. It is designed to prevent a district court from engaging in the proverbial search for a needle in the haystack." Jones v. United Parcel Service, 461 F.3d 982, 990 (8th Cir. 2006) (quoted case omitted; discussing local rule similar to 4.01(E)). Plaintiff's failure to comply with Local Rule 4.01(E) has complicated the Court's efforts to determine whether genuine issues of material fact exist. To the extent it has been able to discern the same, the Court will note whenever plaintiff properly disputes a fact and the ground for her dispute. See Huckins v. Hollingsworth, 138 F. App'x 860, 862 (8th Cir. 2005) (unpublished per curiam) (holding the district court did not abuse its discretion in applying its own local rules even though those rules prevented it from considering some facts improperly alleged by plaintiffs that might have been relevant to the summary judgment motion); Northwest Bank & Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 724-25 (8th Cir. 2003) (holding the district court did

## I. Plaintiff's Allegations

1.  Plaintiff instituted this action by filing a pro se Employment Discrimination Complaint alleging St. John's discriminated, harassed and retaliated against her in violation of the ADA.  (<u>See</u> Complaint; PD 8).[2]

2.  Plaintiff's asserted disability in this matter is asthma.  (PD 79).

3.  When asked at deposition about the nature of her claims in this lawsuit, plaintiff testified as follows:

Q.  Okay.  So in this lawsuit, tell me what the nature of your claims are.

A.  That St. John's failed to go by the Americans with Disabilities Act and because of my asthma, they have harassed and retaliated against me.

Q.  So when they -- When you say they didn't comply with the ADA, what do you mean by that?  Is that the --

A.  They haven't -- did not provide me with a safe environment that would keep me from having my asthma exacerbated.  (PD 91-2).

4. As a remedy for the alleged wrongdoing, plaintiff is seeking the following monetary damages:

i. Compensation for increased medical costs due to her asthma;

ii. Back pay for days she missed as a result of her asthma getting worse from working at St. John's; and

iii. Compensation for her emotional distress caused by St. John's.  (<u>See</u> Complaint, PD 272-76).

---

not abuse its discretion by applying local rules that excluded some of the material facts offered in opposition to a motion for summary judgment).

[2]  "PD__" refers to the relevant portions of plaintiff's deposition transcript.

5.    With respect to her claim of discrimination, plaintiff claims St. John's failed to accommodate her request to be assigned to an area of the Intensive Care Unit ("ICU") that was not under or near construction.  (Complaint, ¶ 12; PD 92).

6.  Plaintiff claims the assignment to areas of the ICU under or near construction exacerbated her asthma symptoms. (PD 80).

7.  Plaintiff also claims St. John's discriminated against her by issuing her discipline on December 16, 2007 for violating St. John's Absenteeism and Tardiness Policy.  (PD 106-07).

8. Plaintiff further claims St. John's discriminated against her by making comments about her honesty and failure to help co-workers in her 2006 Annual Appraisal.  (PD 263).

9.  Plaintiff also claims St. John's discriminated against her by issuing her discipline in October 2007 for inappropriate behavior.  (PD 97).

10.  With regard to her harassment claim, plaintiff claims the October 2007 discipline for inappropriate behavior also constituted harassment.  (PD 116).

11.  Plaintiff also claims she was harassed when she did not receive a direct deposit and paycheck stub for the pay period ending September 28, 2007.  (PD 111, 121).

12.  Plaintiff further alleges she was subjected to the following derogatory comments made by co-workers related to her asthma:

i. On January 29, 2007, Chris Carnahan, a RN, asked plaintiff if she was faking another respiratory distress when plaintiff was having problems breathing. Another employee, Eric Allen, checked plaintiff's lungs and said she sounded tight.  (PD 115-16, 282).

ii. On February 4, 2007, Shelly Donnelley asked Katie Kraus whether she ever felt discriminated against. Ms. Donnelley was looking at an employee bulletin board with pictures and talking to Ms. Kraus.  Plaintiff felt like the comment was directed at her. (PD 113-14, 283).

iii.  Plaintiff did not inform management about these comments.  (PD 116).

iv.  St. John's had no knowledge of the comments made by Kraus or Donnelley.  (Dodson Aff., ¶ 10).

13.  With respect to her retaliation claim, plaintiff asserts that the same things that she asserts were harassment (see above) were also retaliatory.  (PD 123).

14.  Plaintiff states the conduct she engaged in for which St. John's purportedly retaliated against her was because (1) she was sick and (2) they did not know quite what to do with her.  (PD 123).  Plaintiff was asked several times during her deposition what conduct she engaged in that she felt was the reason for the retaliation and her answer was consistently that (1) she was sick, and (2) St. John's did not know how to handle it.  (PD 123-24, 290).

## II.  Plaintiff's Proceedings Before the EEOC

15.  On December 3, 2007, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation.  (Def.'s Ex. LL; PD 234).  The Charge of Discrimination was drafted by the EEOC investigator.  (PD 234).

16.  Plaintiff's Charge of Discrimination did not contain any allegation of harassment. (Def.'s Ex. LL).  Plaintiff never amended her Charge of Discrimination to include a claim of harassment.

17.  On December 18, 2007, the EEOC issued a Dismissal and Notice of Rights to plaintiff indicating the EEOC was closing its file on the Charge of Discrimination for the following reason: "The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (Def.'s Ex. MM).

18.  Plaintiff admits she did not experience any retaliation from St. John's as a result of filing a Charge of Discrimination with the EEOC. (PD 159-60).

**III. Plaintiff's Pending Workers' Compensation Claims**

19.  Plaintiff has filed three Workers' Compensation claims covering the same injuries alleged in this lawsuit.  (PD 170, 232).

20.  On December 20, 2006, plaintiff filed a Workers' Compensation claim alleging she suffered "extreme emotion[al] distress brought about by the harassment about my disability (asthma) in BJ Hipsky['s] office."  (PD 248; Def.'s Ex. RR).

21.  Plaintiff intends the Workers' Compensation claim to cover the incident in Betty Jean Hipsky's office (explained in detail below) and being assigned to construction areas that had outside air being pumped in (explained in detail below).  (PD 248).

22.  On January 31, 2007, plaintiff filed another Workers' Compensation claim alleging she suffered the following injury: "Unit 476 under construction, triggering and asthma attack . . . ."  (PD 252; Def.'s Ex. TT).

23.  Plaintiff intends the second Workers' Compensation claim to cover asthma-related injuries she suffered between December 20, 2006 and January 31, 2007.  (PD 252-53).

24.  Both the December 20, 2006 and January 31, 2007 Workers' Compensation claims are still pending and were recently consolidated by the Workers' Compensation Judge.  (PD 249, 253).

25.  On December 17, 2008, plaintiff filed a third Workers' Compensation claim regarding the following injury which occurred on December 18, 2008: "respiratory distress after being exposed to toxic chemical."  (PD 254-55; Def.'s Ex. UU).

### IV. St. John's and its Policies

26.  St. John's is a not-for-profit corporation organized under the laws of the State of Missouri, operating as a provider of medical center and medical care.  (Dodson Aff., ¶ 4).

27.  St. John's maintains a Policy and Procedure Manual ("Manual") and makes the Manual available to all employees through the employee intranet system.  (Dodson Aff., ¶ 11).

28.  Hard copies of the Manual or any policy contained therein are also available in St. John's Employee Relations office.  (Dodson Aff., ¶ 12).

29.  St. John's Statement on Employer/Co-Worker Relations, contained in the Manual, provides, in part: "St. John's Mercy will ensure equal employment opportunities for all persons regardless of race, color, creed … disability or veteran status in all employment practices including but not limited to recruiting, hiring, transfer, promotion, training, compensation, benefits, workforce reduction or termination."  (Def.'s Ex. I; Dodson Aff., ¶ 13).

30.  St. John's Equal Employment Opportunity Policy, set forth in the Manual, states, in pertinent part:

> St. John's Mercy will ensure equal employment opportunity for all persons regardless of race, color, religion, national origin, gender, age, handicap, disability…in all employment practices and terms and conditions of employment. ...  Discrimination against any person based on any of these factors is unacceptable conduct and will not be tolerated.  Retaliation against or intimidation of any co-worker who has filed a complaint regarding alleged violations of these objectives will not be tolerated. Co-workers are encouraged to contact Human Resources if they believe they have been discriminated against ….

(Def.'s Ex. G).  The Equal Employment Opportunity Policy is discussed and reviewed with employees during orientation, is available electronically on St. John's Internet site, and is available upon request to any St. John's supervisor or manager.  (Dodson Aff., ¶ 14).

31.  St. John's No Harassment Policy, set forth in its Manual, states, in pertinent part:

St. John's Mercy does not tolerate harassment of our job applicants, employees, patients or visitors.  Any form of harassment related to an individual's … disability or handicap is a violation of this policy and will be treated for disciplinary matter … If an employee believes that he or she is being harassed … the employee should immediately make his or her concern known to the employee's immediate supervisor … If the employee does not feel that the matter can be discussed with his/her supervisor, or if the employee is not satisfied with the way the report has been handled, he/she can arrange for a conference with the Director of Human Resources to discuss the complaint.  Employees should not assume St. John's Mercy is aware of the harassment.  It is each employee's responsibility to report incidents about which the employee receives knowledge.

(Def.'s Ex. H).

32.  The No Harassment Policy is discussed and reviewed with employees during orientation, is available electronically on St. John's intranet site, and is available upon request to any St. John's supervisor or manager.  (Dodson Aff., ¶ 16).

33.  St. John's "Open Door" Policy, also set forth in the Manual, states, in pertinent part: "Co-workers have the ability to discuss any work-related matter with their immediate supervisor, or any superior of their supervisor including any member of Administration, or with a Human Resources representative at any time …."  (Def.'s Ex. J).

34.  The Open Door Policy is discussed and reviewed with employees during orientation, is available electronically on St. John's intranet site, and is available upon request to any St. John's supervisor or manager. (Dodson Aff., ¶ 18).

35.  The St. John's Absenteeism and Tardiness Policy provides as follows:

To meet our commitment to quality patient care, each employee is needed and expected to be on the job, at his or her work station ready to work when the shift begins and until the shift ends.  If an employee is unable to work his or her scheduled shift, he or she is responsible for calling before the start of the shift to explain the

absence to the appropriate department contact person, according to the department's established procedure.

ABSENCE is defined as: less than 24 hours' notice and missing at least half of a scheduled shift, or more than 24 hours' notice without obtaining proper coverage.

Employees receive discipline for frequent absenteeism as follows:

> 1. Four unscheduled absences within any continuous three-month period will result in a First Counseling.
>
> . . . .
>
> 2. Two additional unscheduled absences (a total of six within any continuous five-month period) will result in a Second Counseling.
>
> 3. Two additional unscheduled absences (a total of eight within any continuous seven-month period) will result in a Final Counseling.
>
> 4. Two additional unscheduled absences (a total of 10 within any continuous 10-month period) will result in termination.

(Dodson Aff., ¶ 20; Def.'s Ex .GGG).

36. The absence rates are prorated for part-time employees who work less than half the hours of a full time employee as follows: First Counseling for 2 absences within 3 months; Second Counseling for 3 absences within 5 months; Final Counseling for 4 absences over 7 months; and Discharge for 5 absences over 10 months. (Def.'s Ex. GGG).

37. The Absence and Tardiness Policy is discussed and reviewed with employees during orientation, is available electronically on St. John's intranet site, and is available upon request to any St. John's supervisor or manager. (Dodson Aff., ¶ 20).

38. Plaintiff acknowledges that her attendance at her assigned shifts is an essential function of her employment. (PD 30).

**39.** St. John's Rules and Regulations Policy provides, in pertinent part, as follows:

The orderly and efficient operation of St. John's Mercy requires that employees maintain discipline and proper personal standards of conduct at all times, in order to maintain a high quality of patient care and to protect St. John's Mercy's good will and property. It is the employee's responsibility to observe the rules and regulations and standards of conduct expected of all employees as contained in the following rules.

(Def.'s Ex. HHH; Dodson Aff., ¶ 23).

40. Under the Rules and Regulations Policy, "inappropriate behavior/language" constitutes a Major Offense. (Def.'s Ex. HHH; Dodson Aff., ¶ 24).

41. Employees received discipline as follows for Major Offenses as follows:

      First Offense - Final Counseling

      Second Offense – Discharge

42. The Rules and Regulations Policy is discussed and reviewed with employees during orientation, is available electronically on St. John's intranet site, and is available upon request to any St. John's supervisor or manager. (Dodson Aff., ¶ 25).

**V. Construction Projects at St. John's**

43. From time to time, St. John's updates its facilities.

44. While conducting construction on its premises, St. John's takes every precaution not to expose any of its patients, visitors or employees to unsafe conditions. During construction projects, St. John's takes every precaution to prevent construction debris or air from to invading patient care areas. (Warner Aff., ¶ 8).

45. In order to provide safe uninterrupted patient care, St. John's has an Infection Prevention and Control Measure Policy which is strictly followed. (Warner Aff., ¶ 9).

46. St. John's began construction of its new Heart Hospital in January 2004. (Warner Aff., ¶ 3).

47. The new Heart Hospital was built adjacent to the Tower C building which houses ICU Units 475 and 476. (Warner Aff., ¶ 4).

48. The Heart Hospital construction was completed in May 2006 with patient occupancy in July 2006. (Warner Aff., ¶ 5).

49. In January 2006, St. John's began construction of the bridge connectors from the Heart Hospital to Tower C. The bridge connectors connected the Heart Hospital to ICU Units 475 and 476. (Warner Aff., ¶ 6).

50. The construction of the bridge connectors was completed in July 2006. (Warner Aff., ¶ 7).

51. With regard to the Heart Hospital and bridge connector construction, ICU Unit 476 never had a temporary ventilation system installed during the said construction projects. (Warner Aff., ¶ 10).

52. There has never been a dedicated ventilation system for ICU Unit 476. Rather, the area is served by an HVAC system that serves the rest of the entire 4th floor of Tower C. (Warner Aff., ¶ 11).

53. At no time was there ever outside air being pumped into the ICU Units in Tower C, the Heart Hospital construction area or the bridge connector construction area. (Warner Aff., ¶ 12).

54. During the construction of the bridge connectors between the Heart Hospital and ICU Units 475 and 476, a hole was cut between Rooms 5 and 6 in ICU Unit 476 in which a fan and high efficiency filter were placed. (Warner Aff., ¶ 13).

55. The purpose of the fan and high efficiency filter was to allow for recirculation of the air inside the bridge connector construction area and in order to maintain a negative pressure inside the construction area. The fan recirculated the air inside the bridge connector construction area and pushed the air through a 95% high efficiency filter before the filtered air was blown into Unit 476. The bridge connector construction area was otherwise walled off from Unit 476. (Warner Aff., ¶ 15).

56. The recirculation fan and high efficiency filter were removed from the hole in the wall in Unit 476 by July 2006. (Warner Aff., ¶ 16).

57. The only other construction during the relevant time period occurred in ICU Unit 490. Specifically, there was construction in the ICU Unit 490 waiting room whereby a waiting room was created at the entrance of the 490S Unit and a staff break/locker/restroom area was created. This construction occurred between December 2005 and April 2006. In addition, construction to provide additional cooling capacity to the center core area of ICU Unit 490 was completed between May 2006 and August 2006. (Warner Aff., ¶ 17).

**VI. Plaintiff's Asthma Symptoms**

58. Plaintiff was diagnosed with asthma by her personal physician, Dr. John Wood, in 1990 following a trip to Florida. (PD 16).

59. Plaintiff has allergenic asthma. (PD 125).

60. Molds and ragweed make plaintiff sick and trigger her asthma. (PD 125).

61. Dr. Seth Paskon became plaintiff's personal physician in approximately 1998. (PD 43).

62. In June or July 2006, plaintiff kept getting sick and could not get over it. Her asthma symptoms were getting worse. (PD 64).

63. Dr. Paskon prescribed plaintiff Prednisone but it did not work. (PD 64).

64.  In September 2006, Dr. Paskon sent plaintiff to an allergy specialist, Dr. John Marcum. (PD 64).

65.  Dr. Marcum never diagnosed plaintiff's asthma as being triggered by emotional distress. (PD 66).

66.  Dr. Marcum told plaintiff he did not think her asthma was triggered by emotional distress. (PD 179).

67.  Dr. Marcum never diagnosed plaintiff's asthma as being triggered by construction areas. (PD 71-72).

**VII.  Plaintiff's Employment with St. John's**

68.  Plaintiff was hired by St. John's on or about April 17, 2000 as a Registered Nurse ("RN") in its Medical Surgery Intensive Care Unit ("ICU").  (PD 29).

69.  Plaintiff has remained employed in the ICU through the present.  (PD 29).

70.  For a majority of her employment, plaintiff worked two twelve-hour night shifts per week.  (PD 29; Hipsky Aff., ¶ 10).

71.  Plaintiff only works night shifts.  (PD 29; Hipsky Aff., ¶ 10).

72.  Betty Jean Hipsky, Nurse Manager of the Medical Surgery ICU, has served as plaintiff's immediate supervisor throughout plaintiff's employment with St. John's.  (Hipsky Aff., ¶ 10).

73.  St. John's ICU consists of four units: Unit 474, Unit 475, Unit 476 and Unit 490.  All of the Units operate under the same policies and procedures and receive patients based on space availability.  (PD 30).

74. St. John's employs approximately 150 registered nurses to serve the ICU (the "ICU Nurses"). Approximately 25 ICU Nurses are assigned to each eight to twelve-hour shift. (Hipsky Aff., ¶ 4,8).

75. Clinical Nurse Supervisors ("Supervisors") on each shift determine ICU Nurse patient assignments for each shift. Specifically, the daytime Supervisors determine assignments for the evening shift, and evening Supervisors determine assignments for the next day. (PD 80; Hipsky Aff., ¶ 7).

76. For the most part, all ICU Nurses rotate through and are randomly assigned to the four different ICU Units. (Hipsky Aff., ¶ 6).

77. Because there are 150 ICU Nurses to coordinate, and because the ICU is consistently overcome with emergencies and critical patients, assigning ICU Nurses to Units is a complicated task. (Hipsky Aff., ¶ 9).

78. During her tenure at St. John's, plaintiff received periodic performance evaluations, all of which have been satisfactory. (Hipsky Aff., ¶ 11).

79. For calendar year 2004, plaintiff received an overall performance rating of 1.83 on a scale of 3 and received a 3% wage increase. (PD 260).

80. For calendar year 2005, plaintiff received an overall performance rating of 1.83 on a scale of 3 and received a 3% wage increase. (PD 261).

81. For calendar year 2006, plaintiff received an overall performance rating of 1.83 on a scale of 3 and received a 3% wage increase. (PD 262).

82. For calendar year 2007, plaintiff received an overall performance rating of 1.9 on a scale of 3 and received a 3.1% wage increase. (PD 270).

83. Plaintiff has never been terminated, suspended or demoted during her employment, nor has she ever experienced a wage decrease or freeze. (PD 126).

84. Plaintiff has a history of excessive absenteeism. Specifically, plaintiff received final counseling for excessive absenteeism on four (4) separate occasions: April 30, 2005; October 30, 2005; March 31, 2006; and December 17, 2006 (described in detail below).

85. Plaintiff admits to several absences following her last December 17, 2006 counseling, with no further disciplinary action from St. John's. (PD 78).

86. Plaintiff further admits she was given extended leaves of absence related to her asthma even though she was not entitled to Family Medical Leave Act leave. (PD 151).

87. Specifically, plaintiff was given leave between July 24, 2007 and August 8, 2007, and between October 16, 2007 through November 30, 2007. (PD 175-76, 178-79, 183).

88. Plaintiff was not charged with nor did she receive discipline for any of these absences. (PD 175-76).

**VIII. The Events of December 17, 2006**

89. On December 17, 2006, in accordance with the Absenteeism and Tardiness Policy, Hipsky counseled plaintiff with respect to her excessive absenteeism. (PD 190).

90. Specifically, plaintiff was being counseled for being absent from work 23 times, i.e., for 23 assigned shifts, between July 21, 2006 and December 2, 2006. (PD 75, 190; Hipsky Aff., ¶ 16).

91. Plaintiff does not dispute any of the 23 absences. (PD 190).

92. Plaintiff told Hipsky her asthma was flaring up and that maybe she needed some FMLA until she was feeling better (PD 192-93). Hipsky told plaintiff she was not qualified for FMLA leave.

(PD 193).  Plaintiff also was not qualified for FMLA leave during the period covering the absences for which she received discipline.  (PD 80).

93.  Prior to December 17, 2006, plaintiff never discussed her asthma triggers with anyone at St. John's.  (PD 77).

94.  During the meeting, Hipsky told plaintiff that another co-worker had approached Hipsky and stated that plaintiff had an asthma attack a couple of years ago.  (PD 75, 193).

95.  Hipsky told plaintiff that she was considering assigning plaintiff to ICU 490 because there was unfiltered outside air being pumped into ICU Unit 476.[3]  (PD 76, 193).

96.  Plaintiff admits she never verified whether unfiltered air was being pumped into the ICU. (PD 272).

97.  Plaintiff claims that during her meeting with Hipsky, she realized that being subjected to the unfiltered air in Unit 476 was causing the exacerbation of her asthma symptoms.  (PD 76, 193).

98.  Plaintiff became visibly upset during the meeting with Hipsky.  She began having trouble breathing and had an anaphylactic shock.  (PD 76-77, 194).

99.  Hipsky called Kay Kraus ("Kraus") in and they sent Debbie Moore to get plaintiff's purse containing her asthma medications.  (PD 194).

100.  Once plaintiff got her purse, she gave herself a shot of epinephrine and used her rescue inhaler.  (PD 194).

101.  Kraus then got a wheelchair and took plaintiff to St. John's Emergency Room for treatment.  (PD 198).

---

[3]This fact is strenuously disputed by St. John's, but the Court accepts it as true for purposes of summary judgment.

102.  Plaintiff did not make a request for any accommodation of her asthma at this time.  (PD 82-3).

103.  Hipsky suggested plaintiff should request the move to ICU Unit 490.  (PD 82-3).

104.  Plaintiff did not go back to Hipsky to request an accommodation to be moved to ICU Unit 490.  (PD 83-4).

105.  On December 19, 2006, plaintiff typed a letter that she intended for the Human Resources department, alleging that the December 17, 2006 counseling constituted harassment.  (PD 243).

106.  Plaintiff placed the letter under Betty Jean Hipsky's door, at night, with the expectation that Ms. Hipsky would deliver it to Human Resources.  (PD 244).

107.  Ms. Hipsky did not receive this letter.  (Hipsky Aff., ¶ 29).

108.  Plaintiff never followed up with Ms. Hipsky to see if she received the letter.  (PD 244).

109.  Plaintiff never followed up with Human Resources to inquire whether the letter was received.  (PD 244).

110.  In late December 2006, Lois Dodson, Manager of Employee Relations, received a copy of a Worker's Compensation claim filed by plaintiff, which asserted that plaintiff suffered an asthma attack in Ms. Hipsky's office and that the attack was the result of ongoing harassment.  (Dodson Aff., ¶ 5).

111.  Upon receiving this report, Ms. Dodson attempted to contact plaintiff by telephone to initiate a harassment investigation.  (Def.'s Ex.; Dodson Aff., ¶ 7).

112.  On December 29, 2006, Ms. Dodson sent plaintiff a letter encouraging plaintiff to meet with her regarding her concerns of harassment and informing her investigation was necessary.  (Def.'s Ex. SS; PD 251).

113.  Plaintiff received Ms. Dodson's letter, but did not talk with Ms. Dodson about it.  (PD 251).

114.  Plaintiff never went to speak to Ms. Dodson following her receipt of Ms. Dodson's letter concerning harassment and a needed investigation.  (PD 251).

**IX. Plaintiff's Requests for Reasonable Accommodation of her Asthma**

115.  After Ms. Hipsky suggested to plaintiff during the December 17, 2006 meeting that she request assignment to Unit 490, plaintiff "thought since we had discussed it, and discussed splitting my days, that that would happen."  (PD 82, 227).

116.  Plaintiff did not make a request for accommodation (i.e., assignment to Unit 490) until January 14, 2007.  Plaintiff made this request via telephone to daytime Supervisor Katie Kraus.  (PD 82).

117.  Plaintiff's request was granted and she was scheduled to work in Unit 490 the same evening, January 14, 2007.  (PD 83).

118.  Subsequent to January 14, 2007, plaintiff received assignments in all four ICU Units. (PD 80, 83).

119.  Plaintiff did not follow up with St. John's at that time to make another request for accommodation, i.e., assignment to Unit 490, even though her earlier request for accommodation on January 14, 2007 was granted.  (PD 85).

120.  If plaintiff had requested an assignment to Unit 490 or any other area away from construction from the Clinical Supervisor on duty prior to the start of every shift, she would have been accommodated.  (Hipsky Aff., ¶ 31).

121.  If plaintiff had requested a reassignment to Unit 490 or any other area away from construction from the Supervisor on duty after the start of her shift, she would have been accommodated.  (Hipsky Aff., ¶ 32).

122.  Plaintiff claims that St. John's failure to accommodate her during this period led to a "life threatening event" on January 29, 2007, when she had an asthma attack.  (PD 82, 217-18).

123.  Plaintiff was assigned to ICU Unit 476 on January 29, 2007 when she had an asthma attack.  (PD 61, 90).

124.  There was no construction in or near Unit 476 at the time.  (Warner Aff., ¶¶ 5-7).

125.  The Heart Hospital construction was completed in May 2006 and the construction of the bridge connectors was completed in July 2006.

126.  Plaintiff made her second, and final, request for accommodation in writing on March 29, 2007, by submitting a note from her physician suggesting permanent assignment to Unit 490. (Def.'s Ex. AA; PD 71, 85).

127.  The physician's note stated as follows:  "Please excuse work in construction area due to severe allergic asthma."  (Def.'s Ex. AA).

128.  Plaintiff admits that following her March 29, 2007 physician's note, she was assigned exclusively to Unit 490, without issue, for almost two years.  (PD 81-82, 85-86).

129.  As noted above, scheduling ICU Nurse assignments are one of the more complicated tasks of an ICU Supervisor.  (Hipsky Aff., ¶ 9).

130. Accordingly, St. John's arranged for plaintiff to call the ICU Supervisors prior to her shifts, usually around 5:30 p.m., to confirm her assignment in Unit 490 for that evening. (Fritz Aff., ¶ 6).

131. Plaintiff admits to calling in before every shift to confirm assignment to Unit 490, and that she has been accommodated accordingly. (PD 132).

132. The Supervisors find this process an efficient interaction to assure a successful accommodation for plaintiff. (Fritz Aff., ¶¶ 6-7).

133. Plaintiff admits that the accommodation provided relief for her asthma symptoms. (PD 60, 87, 121, 191).

134. Plaintiff alleges that St. John's failed to accommodate her disability on December 18, 2008 when she was "pulled" from the ICU to assist in another hospital department, the Medical Intermediate Care Unit ("MI"), due to staffing needs. (PD 60-61, 91).

135. Prior to plaintiff's December 18, 2008 shift, Supervisor Erica Fritz ("Fritz") explained to plaintiff that additional staffing was needed in the "MI" and that it was plaintiff's "pull date." (PD 161; Fritz Aff., ¶ 8).

136. Plaintiff admits that she agreed to this assignment, so long as she was not exposed to a construction zone – which she was not. Ms. Fritz assured her there was no construction in the MI. (PD 161).

137. Plaintiff suffered an asthma attack that evening, which plaintiff asserts was induced by exposure to a floor stripping chemical used by the Maintenance Department. (PD 162).

138. Plaintiff admits that she never requested the accommodation of assignment away from mold or similar toxins.

139. Plaintiff's March 29, 2007 physician's note referenced only accommodation by means of assignment to a construction free zone. (Def.'s Ex. AA).

140. Ms. Fritz had no notice that floor stripping procedures were going to be occurring that evening in or around plaintiff's assignment area, nor was she aware that floor stripping chemicals would exacerbate plaintiff's condition. (Fritz Aff., ¶ 16).

141. Following the December 18, 2008 assignment, plaintiff has been assigned without fail to ICU Unit 490. (PD 177; Fritz Aff., ¶ 17).

142. Plaintiff's employee mailbox has been moved to Unit 490 while every other ICU Nurse's mailbox is located in Unit 475. (PD 283).

143. Plaintiff's performance appraisals are now conducted in Unit 490, as opposed to Ms. Hipsky's office. (Hipsky Aff., ¶ 34).

144. Plaintiff has not been required to attend mandatory shift meetings which are held at the beginning of every shift located between Units 475 and 476. (PD 283).

**X. Events of October 2007**

145. Plaintiff states that between March 29, 2007 and October 2, 2007, all alleged discrimination, harassment and retaliation by St. John's subsided. (PD 119).

146. On or about October 2, 2007, plaintiff claims that St. John's harassed her by failing to provide her with a paystub and failed to direct deposit her paycheck for the pay period ending September 28, 2007.

147. Plaintiff became aware of the missing pay stub and bank deposit on October 2, 2007. (PD 98).

148.  As a result, plaintiff placed telephone calls to, among others, Cathy Workman in the payroll department and Office Administrator Pat Englaender.  (PD 100-05).

149.  Thereafter, Ms. Workman and Ms. Englaender notified the Employee Relations office that plaintiff had used inappropriate and vulgar language on the telephone.

150.  Specifically, Ms. Workman and Ms. Englaender notified the Employee Relations office that plaintiff had called them very upset about her paycheck.  They described plaintiff's behavior as "yelling and screaming."  They identified plaintiff's comments as: "My paycheck is wrong … and St. John's has screwed me again!  I'm sick and tired of that f---ing hospital not paying me correctly!  You better get me an offline check and I mean today!"  (Carter Aff., ¶ 7).

151.  Ms. Workman and Ms. Englaender further notified St. John's that plaintiff's husband was screaming profanities, obscenities and threatening comments in the background of the telephone call.  (Carter Aff., ¶ 5).

152.  Ms. Englaender explained to plaintiff that the computer system was temporarily down and that she couldn't pull up plaintiff's payment information at the moment.  (PD 207).

153.  Ms. Englaender reported that plaintiff's response was, "I don't care what your f--- ing problem is!  I want an offline check and I mean now!"  (Englaender Aff., ¶ 7).

154.  Plaintiff admits she told Ms. Englaender that she did not care if she had "to move heaven or earth or even God himself I need a paycheck today."  (PD 101).

155.  When Ms. Englaender was able to access the computer system, she was able to identify the issue – that plaintiff had not properly clocked in or out for two of her four shifts.  (PD 207; Englaender Aff., ¶11).

156. Ms. Englaender reported that plaintiff accused her of intentionally removing the time punches to "screw up her paycheck." (Englaender Aff., ¶12).

157. Ms. Englaender reminded plaintiff that notices had been posted reminding employees to check for missing time punches. (PD 209; Englaender Aff., ¶13).

158. Plaintiff responded that she didn't read memos posted by St. John's management. (Englaender Aff., ¶14).

159. Plaintiff admits that her husband spoke to Ms. Workman at this time because she was taking a respiratory treatment, and that her husband "wasn't being nice." (PD 101, 209).

160. Plaintiff is "sure [her husband] raised his voice. [She] heard it over her respiratory machine, so he must have raised his voice." (PD 101).

161. Plaintiff eventually "took the phone away from [her husband] . . . because she didn't like how he was talking . . . ." (PD 102).

162. Plaintiff also called Lois Dodson following her conversations with Ms. Workman and Ms. Englaender, to make sure she got her paycheck. (PD 106).

163. Ms. Dodson told plaintiff that she did not want to be subjected to plaintiff's husband. (PD 106).

164. St. John's payroll department was able to correct the problem and issue plaintiff her paycheck the same day she notified St. John's of the problem. (PD 100).

165. Plaintiff was paid in full and suffered no adverse consequences because of the payroll mishap. (PD 106).

166. Plaintiff has not encountered any further problems receiving a paycheck.

167.  On October 2, 2007, plaintiff's husband spoke to Joseph Laffleur and complained about the paycheck issue.  (PD 117).

168.  In response, Robert Ruello, Vice President of Human Resources at St. John's, placed a call to plaintiff to investigate her concerns.  (PD 117).

169.  On October 2, 2007, plaintiff placed a phone call to Chris Carter, Manager of Employee Relations, inquiring how to file a grievance based on not receiving a paycheck.  (PD 111, 212-13).

170.  Plaintiff also complained to Mr. Carter about ongoing harassment.  (PD 212-13).

171.  In response, Mr. Carter explained St. John's Open Door Policy and encouraged plaintiff to come in and discuss any harassment or discrimination she felt she was experiencing.  (PD 108, 212).

172.  Mr. Carter told plaintiff that she had the option of bringing a co-worker to the meeting, if it would make her feel more comfortable.  (PD 212).

173.  Plaintiff never went to talk to Mr. Carter about the alleged harassment.  (PD 213).

174.  In response to internal complaints filed by Ms. Workman and Ms. Englaender regarding plaintiff's conduct, Mr. Carter conducted an internal investigation into the events of October 2, 2007.  (PD 108-09; Carter Aff., ¶¶ 5-6).

175.  Specifically, Mr. Carter met with plaintiff on or about October 8, 2007 to investigate her conduct.  (PD 107; Carter Aff., ¶ 12).

176.  This meeting took place in the St. John's cafeteria, as opposed to the Employee Relations office, at plaintiff's request.  (PD 107; Carter Aff., ¶ 13).

177.  Plaintiff told Mr. Carter that a walk to the Employee Relations office might agitate her asthma.  (Carter Aff., ¶ 13).

178. Plaintiff did not feel safe in Employee Relations office because she had suffered an asthma attack there on December 17, 2006. (PD 107).

179. At the meeting, Mr. Carter advised plaintiff that he was investigating her October 2, 2007 conduct. (PD 109; Carter Aff., ¶ 14).

180. Plaintiff denied using vulgar language in the October 2, 2007 conversation. (PD 205).

181. Mr. Carter spoke with Workman and Englaender and Dodson and then reported information set forth above in paragraphs 150-154, and 156-159.

182. At the conclusion of Mr. Carter's internal investigation, he determined that plaintiff had acted inappropriately towards co-workers, and allowed her husband to do so as well, in violation of the Rules and Regulations. Carter issued plaintiff a final counseling for inappropriate behavior. (Carter Aff., ¶¶ 22-23).

183. Plaintiff did not receive her final counseling in person, because her "respiratory status was getting poor" so she left work prior to the meeting. (PD 153; Carter Aff., ¶¶ 29-30). Plaintiff left St. John's without notifying Mr. Carter or any other supervisor or manager that she was not staying for the meeting. (PD 216, Carter Aff., ¶ 31).

184. As a result, Mr. Carter conducted plaintiff's final counseling over the telephone and by mail, as an accommodation to her illness. (Carter Aff., ¶ 32).

**XI. Plaintiff's 2006 Annual Appraisal**

185. Plaintiff alleges that St. John's discriminated against her by making comments on her Annual Appraisal issued for calendar year 2006, by commenting that she was not always honest, or otherwise, not always helpful to her co-workers. (PD 263).

186. Specifically, the portion of plaintiff's 2006 Annual Appraisal which "suggested objectives or additional accomplishments" for the next review period encouraged plaintiff to:

i. Be open and honest with management and fellow co-workers. Be involved and supportive of decisions that involve the unit and also honest communication with the clinical supervisors.

ii. … Be supportive and a mentor to new staff on your shift as well as others. Facilitate mentoring and retention of staff.

187. Plaintiff received the same rating -- 1.83 out of 3.00 -- in her 2006 Appraisal that she received the previous two years, and she received a 3% wage increase. (PD 262).

188. Subsequent to receiving her 2006 Appraisal, plaintiff filed a Union grievance with respect to her Appraisal. (PD 264).

189. Plaintiff's grievance was denied by the Union for the reason that "a performance evaluation is nothing to be terminated over so there was nothing they could do." (PD 264).

**Discussion**

**A. Exclusivity of Missouri Workers' Compensation Act Remedy**

St. John's first argument for summary judgment is that plaintiff's ADA claims are barred by the exclusivity provisions of the Missouri Workers Compensation Act, Mo. Rev. Stat. § 287.010 (1996). This argument is without merit and runs counter to basic principles of federalism. Under the Supremacy Clause of the Constitution, state law is preempted where it actually conflicts with federal law or "stands as an obstacle" to Congress's full objectives. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984). "A state law making recovery under a worker's compensation statute the exclusive remedy for work-related injuries cannot bar an employee from seeking relief for employment discrimination under the ADA . . . in light of the Supremacy Clause of Article VI of the

Constitution." Worthington v. City of New Haven, 1999 WL 958627, *8 (D. Conn. Oct. 5, 1999) (citing cases). "Legislatures enacted workers compensation schemes to replace state tort law as applied to workplace injuries, not to displace federal laws designed to vindicate discrimination by an employer." Id. The Eighth Circuit rejected an employer's claim that the Missouri workers' compensation statute barred an employee's claim for emotional distress damages under Title VII of the Civil Rights Act of 1964, stating: "Clearly, this exclusivity provision cannot preempt [plaintiff's] federally created right to recover damages for emotional distress under Title VII." Karcher v. Emerson Elec. Co., 94 F.3d 502, 509 (8th Cir. 1996).

**B.  Statute of Limitations**

St. John's next moves for summary judgment on plaintiff's claims of ADA discrimination, retaliation and/or harassment to the extent they arose prior to February 6, 2007, on the grounds that they are barred by the applicable statute of limitations. St. John's states that under the ADA, an individual alleging discrimination must file an administrative charge of discrimination with the EEOC within three hundred (300) days after the alleged unlawful practice occurred. 42 U.S.C. § 2000e-5(e)(1) (applicable to ADA claims under 42 U.S.C. § 12117(a)); Boersig v. Union Elec. Co., 219 F.3d 816, 821 (8th Cir. 2000). A plaintiff's claim is time-barred if the plaintiff filed her EEOC charge more than 300 days after the effective date of the employer's unlawful actions. See Boersig, 219 F.3d at 821. St. John's states that plaintiff filed her charge of discrimination on December 3, 2007, and therefore the Court lacks jurisdiction to consider any alleged violations of the ADA which occurred outside the 300-day statute of limitations, i.e., before February 6, 2007.

St. John's states that with respect to plaintiff's failure to accommodate claims, plaintiff alleges she learned in December 2006 that her supervisor assigned her to an area of the hospital which was

under construction, and on January 14, 2007, requested a reasonable accommodation of assignment away from the construction area, to Unit 490. Plaintiff admits she was given the accommodation on January 14, 2007, but nevertheless alleges that St. John's failed to accommodate her which led to "another life threatening episode on January 29, 2007," when she was assigned to Unit 476.[4] St. John's argues that because plaintiff alleges it denied her request for an accommodation on or before January 29, 2007--a week prior to February 6, 2007--her failure to accommodate claim occurred outside of the 300-day statute of limitations period and must be dismissed as untimely.

St. John's also moves for summary judgment on plaintiff's claim that St. John's discriminated against her when it issued her attendance discipline on December 17, 2006. St. John's states that on December 17, 2006, plaintiff was counseled for being absent from work for twenty-three assigned shifts, between July 21, 2006 and December 2, 2006. St. John's asserts that this counseling occurred nearly two months beyond the 300-day statute of limitations and, therefore, must be dismissed.

Finally, St. John's states that plaintiff alleges she was subjected to two isolated comments made by co-workers purportedly related to her disability. First, on January 29, 2007, Chris Carnahan, a RN, asked plaintiff if she was faking another respiratory distress when plaintiff was having problems breathing. Second, on February 4, 2007, Shelley Donnelly asked Katie Kraus whether she ever felt discriminated against. Plaintiff felt like the comment was directed at her. Plaintiff admittedly did not bring these matters to the attention of any manager and does not allege any other derogatory comments related to her disability within the 300-day statute of limitations. St. John's asserts that

---

[4]The undisputed evidence is that no construction was occurred in Unit 476 at the time of plaintiff's January 29, 2007 asthma episode.

these statements by co-workers fall outside the 300-day statute of limitations and therefore must be dismissed.

Plaintiff responds that her claims are timely because she filed her claim with the EEOC on October 18, 2007. Plaintiff also asserts that an EEOC investigator told her the December 17, 2006 allegations could still be considered in her lawsuit because it was a "recurrent pattern of the same offenses, that started on 12/17/06." Pl.'s Response at 3-4.

St. John's replies that the Eighth Circuit has consistently held that an intake questionnaire, such as plaintiff attempts to rely on, cannot constitute a charge of discrimination for purposes of meeting the relevant statute of limitations, citing Schlueter v. Anheuser-Busch, Inc., 132 F.3d 455 (8th Cir. 1999) (Title VII and Age Discrimination in Employment Act ("ADEA"), and Hodges v. Northwest Airlines, Inc., 990 F.2d 1030 (8th Cir. 1993) (Title VII). Thus, St. John's argues plaintiff cannot establish that allegations which occurred prior to February 6, 2007 were timely based on the completion of her intake questionnaire. Finally, St. John's asserts that even if the October 18, 2007 intake questionnaire is considered a charge of discrimination, plaintiff cannot establish that her December 17, 2006 claim of discrimination falls within the 300-day period.

Under the ADA, an individual alleging discrimination must file an administrative charge of discrimination with the EEOC within three hundred (300) days after the alleged unlawful practice occurred. 42 U.S.C. § 2000e-5(e)(1) (applicable to ADA claims under 42 U.S.C. § 12117(a)); Boersig, 219 F.3d at 821. A plaintiff's claim is time-barred if she filed her EEOC charge more than 300 days after the effective date of the employer's unlawful actions. Id.

St. John's is correct that the Eighth Circuit has consistently held intake questionnaires which are neither signed under oath nor verified do not satisfy the statutory requirement for an

administrative charge of discrimination.  See, e.g., Diez v. Minnesota Min. and Mfg. Co., 88 F.3d 672 (8th Cir. 1996) (ADEA); Shempert v. Hardwick Chemical Corp., 151 F.3d 793, 796 (8th Cir. 1998) (Title VII).  In Diez, the plaintiff filed an intake questionnaire on May 21, 1993, giving detailed complaints and the names of parties he claimed discriminated against him.  The information in the questionnaire was not filed via a verified Charge of Discrimination until June 10, 1993.  The Eighth Circuit held that the June 10, 1993, date was the proper date for determining whether the claim had been filed within 300 days of the act of discrimination.

Since these Eighth Circuit cases were decided, however, the United States Supreme Court addressed a similar issue and reached a different result in Edelman v. Lynchburg College, 535 U.S. 106 (2002).  In Edelman, the Court held that a Title VII EEOC charge need not be verified within 300 days of the alleged discrimination if some type of complaint meeting the statutory requirements of a charge was filed within 300 days, in which case there could be relation back.  In Edelman, a college professor had sent the EEOC a facsimile letter alleging that he was denied tenure in violation of Title VII.  Although the fax was sent within 300 days of the alleged discrimination, the plaintiff failed to file an actual charge with the EEOC until 313 days after the alleged discrimination.  Id. at 109-10.

The Supreme Court held that the EEOC charge could relate back in time to the date of the letter, but only if the letter met the statutory definition of a charge.  Id. at 118-19.  The Court declined to decide that issue and remanded to the Fourth Circuit Court of Appeals for further consideration.  Id. at 119.  On remand, the Fourth Circuit held that the faxed letter met all statutory requirements of a charge of discrimination, and that the verification on the subsequent Charge of

Discrimination related back to the faxed letter to the extent the claims included in the Charge were also asserted in the letter. Edelman v. Lynchburg College, 300 F.3d 400, 405 (4th Cir. 2002).

This Court has held that the Supreme Court's Edelman decision appears to overrule the presumption in the Eighth Circuit that an intake questionnaire or charge information form is not a charging document, and instead requires the Court to review the information provided in the questionnaire to determine whether it meets the statutory requirements of a charge of discrimination under the ADA. See Henry v. Missouri Dep't of Transportation, 2009 WL 995546, **4-5 (E.D. Mo. Apr. 14, 2009) (charge information form met statutory requirements of a charge under Title VII); Gross v. Missouri Mounting, 2005 WL 3560592, **1-3 (E.D. Mo. Dec. 29, 2005) (intake questionnaire met statutory requirements of a charge under the Age Discrimination in Employment Act); Sifferman v. Board of Regents, Southeast Mo. State Univ., 250 F.Supp.2d 1139, 1143 (E.D. Mo. 2003) (intake questionnaire met statutory requirements of a charge under Title VII).

A charge of discrimination is liberally interpreted and must include, among other things, "the full name, address, and telephone number of the person making the charge" and "[a] clear and concise statement of the facts." 29 C.F.R. § 1601.12(a). Notwithstanding other provisions, a "charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Id. § 1601.12(b). St. John's does not challenge the status of plaintiff's intake questionnaire as a charge of discrimination based on its substantive contents. Accordingly, it is not necessary for the Court to consider whether the contents of the intake questionnaire satisfy the liberal definition of a charge under 29 C.F.R. § 1601.12(b). Cf. Sifferman, 250 F.Supp.2d at 1143, n.1. For purposes of the instant motion, the Court concludes that plaintiff's Charge of Discrimination relates back to the

date of her Intake Questionnaire, to the extent the claims in the Charge were also asserted in the Intake Questionnaire.

As a result, the appropriate date for timeliness purposes is October 18, 2007. St. John's motion for summary judgment based on timeliness should therefore be denied with respect to plaintiff's claims concerning the January 29, 2007 failure to accommodate claim and the co-workers' comments of February 4, 2007.

St. John's argues that plaintiff's claim concerning the December 17, 2006 attendance counseling is untimely even if the Intake Questionnaire is considered a charge of discrimination. In response, plaintiff appears to suggest that this incident constitutes a continuing violation. The plaintiff bears the burden of proof to show that the discriminatory events took place within the statutory period. Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 774 (8th Cir. 2004).

The Supreme Court addressed the continuing violation doctrine in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), and held that for purposes of a hostile environment claim, conduct that occurred outside the statutory time period could be considered in determining liability:

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Id. at 117.

The Supreme Court also "clarified that the continuing violation doctrine is not available to toll the limitations or revive a claim involving a separate act of discrimination that occurred beyond

the 300-day limitation." <u>Wedow v. City of Kansas City, Mo.</u>, 442 F.3d 661, 670 (8th Cir. 2006) (citing <u>Morgan</u>, 536 U.S. at 113-14). "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." <u>Id.</u> (citing <u>Morgan</u>, 536 U.S. at 112). However, "Prior acts may be used as background evidence in support of a timely claim." <u>Id.</u> (citing <u>Morgan</u>, 536 U.S. at 113).

Plaintiff does not explain how the December 17, 2006 attendance discipline relates to any of the alleged discriminatory events that occurred within the 300-day period. The Court finds that the attendance discipline is not related to plaintiff's other claimed discriminatory events--two instances of co-worker comments, one instance in late September 2007 when plaintiff did not receive her paycheck, and a final discipline issued in October 2007 for plaintiff's alleged inappropriate behavior to co-workers concerning the missing paycheck. It is undisputed that plaintiff never received any further discipline related to attendance. The Court therefore concludes that St. John's is entitled to summary judgment on plaintiff's claims concerning the December 17, 2006 discipline based on the statute of limitations. Further, in the alternative, as discussed below, the Court concludes that St. John's is entitled to summary judgment on the merits of plaintiff's claims concerning the December 17, 2006 discipline.

### C. Disability Discrimination Claims

The ADA prohibits employers from discriminating "against a qualified individual with a disability on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where a party alleges a claim of discriminatory

disparate treatment, the traditional burden-shifting framework of <u>McDonnell Douglas</u>[5] applies.  <u>See</u>, e.g., <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc).  The plaintiff bears the initial burden to establish each element of the prima facie case.  <u>Id.</u> at 1134.  The defendant employer "must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action."  <u>Id.</u> at 1135.  If the employer offers a legitimate, non-discriminatory reason, then "the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual."  <u>Id.</u>

To establish a prima facie case of disability discrimination under the ADA, plaintiff must establish that (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) she suffered an adverse employment action as a result of the disability.  <u>Fenney v. Dakota, Minn. & Eastern R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

Plaintiff alleges that St. John's discriminated against her based on her disability by (1) disciplining her on December 17, 2006 for excessive absenteeism; (2) making comments on her 2006 Annual Appraisal that she had room to improve her honesty and willingness to help co-workers; and (3) disciplining her on October 18**,** 2007 for inappropriate behavior.  For purposes of the instant motion, St. John's does not dispute that plaintiff can establish the first two elements of the prima facie case, but argues plaintiff cannot establish that she suffered an adverse employment action with respect to any of these allegations.  The Court agrees.

The Eighth Circuit has instructed that an adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.  <u>See</u> <u>Cossette v. Minn. Power</u>

[5]<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).

& Light, 188 F.3d 964, 972 (8th Cir.1999). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not[.]" Spears v. Missouri Dep't of Corr. and Human Resources, 210 F.3d 850, 853 (8th Cir. 2000) (internal citations omitted).

The Court will address each of plaintiff's claimed adverse employment actions separately. First, plaintiff challenges her December 17, 2006 counseling for excessive absenteeism. Plaintiff received a final counseling for twenty-three absences within a five-month period, without receiving any further discipline from St. John's. There is no evidence that plaintiff's terms of employment were materially altered as a result of this discipline, as she did not receive a loss in pay, a demotion, or other material change in employment. Plaintiff contends that the discipline was an adverse action because it was false and interferes with a "vital part of [her] employment and responsibility as an RN" because, with the threat of termination hanging over her head, she cannot speak up as a patient advocate and mentor to less-experienced staff. Pl.'s Response at 5.[6]

Formal criticisms or reprimands that are not accompanied by additional disciplinary action such as a negative change in grade, salary or other benefits, do not constitute adverse employment actions. Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007); see, e.g.,

---

[6]Plaintiff has not testified or presented any evidence by affidavit or otherwise that St. John's deterred her from advocating on behalf of patient care or mentoring other staff, or threatened her with discipline for engaging in these activities. Unsubstantiated and conclusory statements without support are not sufficient to create an issue of fact to defeat summary judgment. See Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."); Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1109 (8th Cir. 1998).

Higgin v. Gonzales, 481 F.3d 578, 587 (8th Cir. 2007) (supervisor's recommendation that plaintiff be terminated from employment was not an adverse employment action where plaintiff was not terminated); Singletary v. Missouri Dep't of Corrections, 423 F.3d 886, 892 n.5 (8th Cir. 2005) (cited case omitted) (plaintiff's placement on administrative leave pending an investigation by his employer was not an adverse employment action where he maintained his pay, grade, and benefits during the investigation and was returned to his position when the investigation ended). Plaintiff's December 2006 counseling for excessive absenteeism therefore does not constitute an adverse employment action.

Second, plaintiff asserts that comments in her 2006 Performance Appraisal regarding her honesty and helpfulness towards her co-workers constituted an adverse employment action. The comments plaintiff complains of were listed as "suggested objectives or additional accomplishments" for the next review period. Plaintiff was encouraged to "[b]e open and honest with management and fellow coworkers. Be involved and supportive of decisions that involve the unit and also honest communication with the clinical supervisors and nurse manager." Plaintiff was also encouraged to "[b]e supportive and a mentor to new staff on you shift as well as others. Facilitate mentoring and retention of staff."

"A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment." Spears, 210 F.3d at 854. "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Id.

Plaintiff did not receive a poor performance rating in 2006, as she received the same satisfactory rating she received the previous two years, and received the same pay increase as in the

previous two years. The comments plaintiff complains of are merely suggestions for improvement, and cannot reasonably be considered an attack on her character. More importantly, plaintiff presents no evidence that the comments she complains of had any effect on the terms or conditions of her employment, or that St. John's subsequently used the evaluation to her detriment. Plaintiff's unsupported contention that the evaluation subjectively interfered with her ability to perform her job does not rise to the level of an adverse employment action. See, e.g., Spears, 210 F.3d at 854 (evaluation that "demeaned [plaintiff] in the eyes of her coworkers," was insufficient to transform an unfavorable evaluation into an adverse employment action); Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999) (evaluation causing loss of status or prestige was not actionable). The suggestions for improvement in plaintiff's performance evaluation therefore do not constitute an adverse employment action.

Finally, plaintiff asserts that a "final counseling" she received on October 15, 2007 for inappropriate and offensive behavior with co-workers regarding her missing paycheck was an adverse employment action. There is no evidence that plaintiff's terms of employment were materially altered as a result of this discipline, as she did not receive a loss in pay, a demotion, or other material change in employment. See Elnashar, 484 F.3d at 1058 ("A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse."). Plaintiff's unsupported assertion that the discipline "has interfered with a vital responsibility of [her] career as a patent advocate and mentor to less experienced staff," Pl.'s Response at 6, does not establish a material alteration in the terms of her employment. See Cossette, 188 F.3d at 972 (evaluation causing loss of status or prestige was not actionable). As a result, the October 15, 2007 discipline cannot be considered an adverse employment action.

St. John's has met its burden to establish that no genuine issues of material fact exist with respect to plaintiff's disability discrimination claims, and it is entitled to summary judgment on these claims as a matter of law.

**D. Failure to Accommodate Claims**

Plaintiff also asserts that St. John's failed to accommodate her request to be assigned to an ICU unit outside of the hospital's construction zone. An employer's failure to make a reasonable accommodation is a separate form of prohibited discrimination under the ADA. Peebles v. Potter, 354 F.3d 761, 765 (8th Cir. 2004). The ADA mandates that employers provide "reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. §12112(b)(5)(A).

ADA reasonable accommodation claims are evaluated under a "modified burden-shifting analysis" rather than under the familiar three-part McDonnell Douglas standard. Peebles, 354 F.3d at 767. Under this analysis, the plaintiff must first establish a prima facie case by showing that she is disabled within the meaning of the ADA, has suffered an adverse employment action, and is qualified for the job with or without accommodation. Brannon v. Luco Mop Co., 521 F.3d 843, 848 (8th Cir. 2008) (citing Fenney, 327 F.3d at 712). Where the employee claims she is unable to perform the essential functions of the job without a reasonable accommodation, the employee "must only make a 'facial showing that a reasonable accommodation is possible.'" Fenney, 327 F.3d at 712 (quoting Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995)). When the

employee makes the required facial showing, "[t]he burden of production [then] shifts to the employer to show that it is unable to accommodate the employee." Id. (quoting Benson, 62 F.3d at 1112).

St. John's moves for summary judgment on plaintiff's reasonable accommodation claims on the grounds that plaintiff cannot establish she suffered an adverse employment action, and cannot establish that St. John's failed to make a good faith reasonable accommodation of her disability. The Court agrees with St. John's on both points.

### 1. Adverse Employment Action

As discussed above, there is no evidence that plaintiff suffered a material change in the terms or conditions of her employment, and this is not a case where plaintiff was terminated or demoted because of an alleged failure to accommodate her disability. Plaintiff therefore fails to establish a required element of her prima facie case. Plaintiff's unsupported assertion that an adverse employment action exists because St. John's "interfered with a vital function of my nursing career (patients['] advocate & mentor to other staff)," Pl.'s Response at 10, does not raise an issue of material fact as to whether she suffered an adverse employment action. This unsubstantiated and conclusory statement without support is not sufficient to create an issue of fact to defeat summary judgment. See Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."). The Court concludes that St. John's is entitled to summary judgment on plaintiff's reasonable accommodation claims.

## 2. Good Faith Effort to Accommodate

Moreover, even if plaintiff could establish that she suffered an adverse employment action, St. John's met its duty to engage in the interactive process with plaintiff in a good faith effort to accommodate her disability.

"Under the ADA, an employer is required to provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee with a disability, unless the requisite accommodation would impose an undue hardship on the employer's business. See 42 U.S.C. § 12112(b)(5)(A)." Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862 (8th Cir. 2006). "Where the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations." Id. (quoting 29 C.F.R. § 1630.2(o)(3)).

A disabled employee must demonstrate the following factors to show that an employer hindered or failed to participate in the interactive process: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Battle, 438 F.3d at 862-63 (citing Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045 (8th Cir. 2005)); Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 952 (8th Cir. 1999).

The record establishes that plaintiff requested only one accommodation for her asthma, that she be assigned to work in a construction free zone, specifically Unit 490. Plaintiff made this request by telephone on January 14, 2007, and her request was honored and she was assigned to Unit 490

for that evening's shift.  After that date through March 28, 2007, plaintiff was assigned in all four

units of St. John's ICU, but she did not make another request for accommodation or ask to be

transferred to another ICU unit.  The record shows there was no construction in any of the St. John's

ICU units during the relevant time period, and that plaintiff was not assigned to a construction area

after requesting assignment away from construction areas.  After plaintiff made a second request for

accommodation on March 29, 2007, in the form of a written physician's request asking that she be

excused from working in construction areas, plaintiff has only been assigned to Unit 490.  St. John's

has also accommodated plaintiff's request by eliminating any need for her to enter another ICU unit

by moving her employee mailbox into Unit 490, excusing her from attendance at routine ICU nurse

meetings because those meetings are held in a conference area between Units 474 and 475, and

conducting her Annual Appraisals in Unit 490.  These undisputed facts establish that St. John's made

a good-faith effort to accommodate plaintiff's disability.

To the extent plaintiff contends St. John's failed to reasonably accommodate her asthma

because there were a few occasions when she was assigned to units other than 490 between January

14, 2007 and March 27, 2007, the contention fails because plaintiff was never assigned to a

construction area, which is the accommodation she requested.[7]  The fact that plaintiff suffered an

asthma attack on January 29, 2007 does not raise an issue of fact as to whether St. John's made a

---

[7]Although plaintiff has asserted without any evidentiary support that there was a fan in Unit
476 which blew outside air containing mold and grass allergens into that unit, St. John's has presented
evidence that the air was not being pumped from the outside but was filtered air from the bridge
connector construction area.  Significantly, it is undisputed that the bridge connector area
construction was completed and the fan in Unit 476 was removed in July 2006, six months before
plaintiff first requested an accommodation in January 2007.

good-faith effort to accommodate her disability. The ADA does not require St. John's to guarantee that plaintiff will never have an asthma attack while at work.

Plaintiff's one-time assignment to assist in another hospital department on December 18, 2008, during which she suffered an asthma attack, similarly does not raise an issue of fact as to whether St. John's made a good-faith effort to accommodate her disability. This is because the record is undisputed that plaintiff was not assigned to work in a construction area on December 18, 2008, and St. John's did not know that plaintiff would be exposed to floor-stripping chemicals on that date, or that plaintiff's exposure to such chemicals could trigger an asthma attack.

Plaintiff's unverified assertion in her response memorandum that St. John's failed to accommodate her asthma by not providing her with unpaid medical leave does not raise an issue of material fact precluding summary judgment, because plaintiff testified in her deposition that the only accommodation she ever requested was assignment to Unit 490. Further, it is undisputed that plaintiff was granted two leaves of absence, from July 24, 2007 to August 8, 2007, and from October 16, 2007 to November 30, 2007, although she was not entitled to FMLA leave, and accumulated numerous absences following the December 17, 2006 "final counseling" for excessive absenteeism, but was never again disciplined for absenteeism.

For these reasons, St. John's is entitled to summary judgment on plaintiff's reasonable accommodations claims.

### E. ADA Harassment Claims

A plaintiff may bring a claim under the ADA for hostile work environment or harassment. Shaver v. Independent Stave Co., 350 F.3d 716, 719 (8th Cir. 2003). To be entitled to relief, the plaintiff must show that (1) she is a member of the class of people protected by the statute, (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions or privileges of her employment. Id. at 720. "In order to be actionable, harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive.'" Id. at 721 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)). Anti-discrimination laws do not establish codes of civility in the workplace and "[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." Shaver, 350 F.3d at 721.

Plaintiff's harassment claim is based on several separate incidents: (1) her final counseling for excessive absenteeism in December 2006, (2) her final counseling for inappropriate behavior in October 2007, (3) when she did not receive a paycheck stub for the pay period ending September 28, 2007, (4) the January 29, 2007 comment by co-worker Chris Carnahan, and (5) the February 4, 2007 comment by co-worker Shelly Donnelley. Plaintiff argues that the two instances of counseling affected the terms, conditions and privileges of her employment because "a nurse must have the right, without fear of termination to speak up[.]" Pl.'s Response at 13. Plaintiff also states, "I cannot think of a more hostile environment than one that has in-damaged [sic] my health and put my life in jeopardy, doing so repeatedly and over a period of time." Id.

St. John's moves for summary judgment on plaintiff's harassment claim on the basis that plaintiff failed to exhaust her administrative remedies, as the Charge of Discrimination does not mention harassment.  Plaintiff responds that the Intake Questionnaire she completed on October 16, 2007 contained allegations of harassment and, therefore, her claim of harassment was exhausted.

Under the ADA, a plaintiff must follow administrative procedures and exhaust administrative remedies by timely filing a charge of discrimination with the EEOC before filing suit in federal court. 42 U.S.C. § 12133 (incorporating the remedies and procedures of Title VII; 42 U.S.C. § 2000e-5(e)(1); see E.E.O.C. v. Commercial Office Prods. Co., 486 U.S. 107, 110-12 (1988); Harris v. P.A.M. Transport, Inc., 339 F.3d 635, 638 (8th Cir. 2003).

"In determining whether an alleged discriminatory act falls within the scope of [an ADA] claim, the administrative complaint must be construed liberally in order not to frustrate the remedial purposes of [the ADA], and the plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge."  Nichols v. American Nat'l Ins. Co., 154 F.3d 875, 886-87 (8th Cir. 1998) (quotation marks, quoted case and internal citation omitted) (discussing Title VII).  "Accordingly, the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC 'investigation which could reasonably be expected to grow out of the charge of discrimination.'"  Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988) (citation omitted).  If a plaintiff were allowed to bring a claim outside the scope of the EEOC charge, it would "circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge[.]"  Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994) (citation omitted).

The Court must examine plaintiff's Charge of Discrimination to determine whether harassment was alleged. St. John's asserts that plaintiff's Charge only asserts discrimination claims based on retaliation and disability, and does not mention harassment. In her Charge, plaintiff checked boxes for "Discrimination Based On" retaliation and disability. No box is provided on the form for harassment, and plaintiff did not check the "other" box. The particulars stated in the charge are as follows:

> I. I was hired by the above named employer in April 2000. My current position title is Registered Nurse.
>
> II. In Dec. 2006 I learned that my Supervisor knowingly allowed me to be assigned in an area of the hospital that was near construction, which subsequently was the cause of my disability exacerbating in the previous months. This lead to unexpected absences. I was disciplined for my absences in December 2006. As a result of this action, I had a life threatening attack.
>
> III. In Dec. 2006 I requested a reasonable accommodation to be assigned to a unit away from the construction. My request wasn't approved until Jan. 29, 2007. Meanwhile I was still subjected to an environment that adversely affected my disability. On Mar. 24, 2007 I was again assigned to the construction area and again my disability worsened.
>
> IV. In Feb. 2007 I filed a complaint against my Supervisor. In Mar. 2007 I filed a grievance regarding my performance evaluation. In Oct. 2007 I was issued a final counseling.
>
> V. I believe that I have been discriminated against due to my disability. I also believe that I have been retaliated against due to my complaints against my Supervisor and the grievance I filed.

The Eighth Circuit has held that charges of harassment generally are not like or related to claims of retaliation and discrimination. See Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir. 2000) (holding that plaintiff's claims of discriminatory demotion and termination as set forth in EEOC charge were not like or related to his claims of harassment by another individual); see

also Duncan v. Delta Consolidated Indus., Inc., 371 F.3d 1020, 1025 (8th Cir. 2004) (holding sexual harassment claim was not like or related to retaliation allegations and therefore was outside the scope of the administrative charge).

The Court concludes that plaintiff's Charge of Discrimination, when liberally construed, does not assert a claim based on harassment, and that plaintiff's claims of harassment are not like or related to her claims of retaliation and disability discrimination. Plaintiff's claims can only be considered exhausted if the Intake Questionnaire is construed as a charge in this context, as the Intake Questionnaire did assert a claim of "ongoing harassment and retaliation."

This Court has previously refused to consider an intake questionnaire in determining the scope of a charge of discrimination, because only the charge of discrimination is sent to the employer and therefore only the charge can affect the process of conciliation:

> The charge questionnaire is not construed as the charge of discrimination when the complainant has signed and submitted an actual charge. "Under the statute . . . it is the charge rather than the questionnaire that matters. Only the charge is sent to the employer, and therefore only the charge can affect the process of conciliation." Novitsky v. American Consulting Engineers, L.L.C., 196 F.3d 699, 702 (7th Cir. 1999) (citing 42 U.S.C. § 2000e-5(b); Perkins v. Silverstein, 939 F.2d 463, 470 (7th Cir. 1991)). See also Price v. Harrah's Maryland Heights Operating Co., 117 F.Supp.2d 919, 922 (E.D. Mo. 2000) ("[A]n intake questionnaire is not a charge."). Cf. B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1102 (9th Cir. 2002) (finding that if a deficiency in a charge is the result of an EEOC representative's negligence, then the questionnaire may be presented as evidence that the claim for relief was administratively exhausted). Based on the authority cited above, the Court will not consider plaintiff's charge questionnaire in determining the scope of her charge of discrimination.

Habib-Stevens v. Trans States Airlines, Inc., 229 F.Supp.2d 945, 946 (E.D. Mo. 2002). See also Winter v. Cycam/MedSource Techs., 166 F. App'x 593, 595 (3rd Cir. 2006) (sexual harassment claims were not exhausted where several incidents were mentioned in the intake questionnaire but not

in the later-filed formal charge of discrimination, "implying that [plaintiff] abandoned those claims in her formal complaint."); <u>Martin v. Central States Emblems, Inc.</u>, 150 F. App'x 852, 857 (10th Cir. 2005) (intake questionnaire was not sufficient to exhaust administrative remedies in light of later filed and more limited formal charge of discrimination); <u>Scott v. Waste Mgmt. of Ark. South</u>, 2006 WL 2523439, *3 (E.D. Ark. Aug. 30, 2006) (dismissing allegations that were included in Intake Questionnaire but not included in Charge of Discrimination).

In this case, plaintiff does not assert that there was a deficiency in her Charge of Discrimination or that she intended the EEOC to investigate allegations of harassment. Plaintiff did not attempt to amend her Charge of Discrimination. Relying on the foregoing authority, the Court refuses to consider plaintiff's Intake Questionnaire in determining the scope of plaintiff's Charge of Discrimination, and holds that plaintiff's claims of disability-related harassment must be dismissed for failure to exhaust her administrative remedies.

### F. ADA Retaliation Claims.

Plaintiff's claims of retaliation are based on the same incidents as her claims of harassment: (1) her final counseling for excessive absenteeism in December 2006, (2) the January 29, 2007 comment by co-worker Chris Carnahan, (3) the February 4, 2007 comment by co-worker Shelly Donnelley, (4) when she did not receive a paycheck for the pay period ending September 28, 2007, and (5) her final counseling for inappropriate behavior in October 2007.

The ADA's anti-retaliation provision states, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ." 42 U.S.C. § 12203(a). To establish a prima facie showing of an ADA retaliation claim, plaintiff must establish the following elements: (1) she engaged in protected conduct; (2) a reasonable

employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Higgins v. Gonzales, 481 F.3d 578, 589 (8th Cir. 2007).  The McDonnell Douglas burden-shifting analysis is applied in the context of an ADA retaliation claim.  Stewart v. Independent Sch. Dist. No. 196, 481 F.3d 1034, 1042-43 (8th Cir. 2007).

St. John's argues that plaintiff cannot establish any element of the prima facie case, because she did not engage in protected activity, the challenged action was not materially adverse, and there was no causal connection between her claimed protected activity and the claimed materially adverse action.[8]

### 1. Protected Activity

"Protected activity is 'an informal or formal complaint about, or other opposition to, an employer's practice or act . . . if the employee reasonably believes such an act to be in violation of the statute in question.'"  Jeseritz v. Potter, 282 F.3d 542, 548 (8th Cir. 2002) (quoting Sherman v. Runyon, 235 F.3d 406, 409 (8th Cir. 2000)).  "Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace."  Kiel, 169 F.3d at 1136 .

St. John's states that during her deposition, plaintiff was asked what conduct she engaged in that led to the alleged retaliation, and she testified that her allegation of retaliation was based solely

---

[8]The prima facie case standard used by St. John's in its motion for summary judgment is the pre-Burlington Northern standard.  This superseded test required a plaintiff to establish that (1) she was engaged in a statutorily protected activity, (2) she suffered an adverse employment action which produced a material employment disadvantage or a material change in the terms or conditions of employment, and (3) there is a causal connection between the two.

on her "being sick" and that St. John's "did not know what to do."[9] St. John's argues that this does not constitute opposing a practice made unlawful by statute. St. John's also notes that plaintiff admits she was not retaliated against in any manner for filing her EEOC Charge or this lawsuit.

In response, plaintiff argues that after she learned from her supervisor on December 17, 2006 that construction and unfiltered air was exacerbating her asthma, she was threatened with termination and then "proceeded with complaints to HR, UFCW, workers compensation and the state board of nursing[.]" Pl.'s Response at 13-14. Plaintiff does not describe these complaints.

Plaintiff's claimed protected activities do not establish the first element of a prima facie case of retaliation for several reasons. First, plaintiff's response is not in the form of an affidavit and is not supported by any evidence. In order to survive a motion for summary judgment, the nonmoving party has the burden of setting forth specific facts to show a genuine issue for trial. Celotex, 477 U.S. at 324. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Morgan v. A. G. Edwards & Sons, Inc., 486 F.3d 1034, 1039 (8th Cir. 2007) (cited case omitted).

Second, plaintiff's allegations in her response contradict her deposition testimony. A party may not attempt to create a sham issue of fact in order to defeat summary judgment. RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995) (citing Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir. 1983)). If a party submits an affidavit on summary judgment which contradicts earlier deposition testimony, the Court should consider whether there was any evidence of confusion or mistake on the part of the party at the time of the deposition.

_____

[9]Plaintiff testified in her deposition that St. John's retaliated against her because she was sick, the hospital was under construction, and St. John's did "not know[] quite what to do about it." (PD at 123, 290).

If not, it is appropriate to disregard the subsequent affidavit to the extent it directly conflicts with the deposition testimony. Francisco v. Burlington Northern R.R. Co., 204 F.3d 787, 790 n.3 (8th Cir. 2000). Here, plaintiff does not submit an affidavit, but attempts to contradict with unsupported allegations her earlier deposition testimony that the sole basis for her retaliation claim was her "being sick" and St. John's not knowing what to do with her. Plaintiff's unsupported allegations are properly disregarded.

Third, even if the Court were to consider the allegations in plaintiff's response, none of plaintiff's claimed actions constitute opposing an unlawful employment practice. Finally, plaintiff alleges that after she was threatened with discipline for excessive absenteeism on December 17, 2006, she began to file various complaints. Plaintiff cannot allege that discipline she received on December 17, 2006 was retaliatory, because it occurred before she began taking any actions that she claims were protected activity. See Stewart, 481 F.3d at 1044 ("[A]lleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event.").

Because plaintiff has not established the first element of her prima facie case, St. John's motion for summary judgment should be granted as to plaintiff's ADA retaliation claims.

### 2. Materially Adverse Action

Assuming plaintiff could present sufficient evidence on the first prong of her prima facie case, she must then demonstrate she suffered an employment action that a reasonable employee would find materially adverse. See Burlington Northern, 548 U.S. at 68; Higgins, 481 F.3d at 589.

In Burlington Northern, the Supreme Court explained that the second element of the prima facie case is objective, requiring courts to consider whether "a reasonable employee would have

found the challenged conduct materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 68 (quotation marks and quoted case omitted). Material adversity is required because "it is important to separate significant from trivial harms." <u>Id.</u> Anti-discrimination statutes neither "set forth 'a general civility code for the American workplace,'" nor are designed to referee "petty slights, minor annoyances, and simple lack of good manners." <u>Id.</u> (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)). Instead, the statutes were intended to "prohibit[ ] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." <u>Id.</u> (quoting <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997)). An objective standard properly gauges the challenged conduct of the employer against the likely actions of a reasonable employee by "avoid[ing] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." <u>Id.</u>

The Eight Circuit's post-<u>Burlington Northern</u> decisions have consistently held that to be materially adverse, retaliation cannot be trivial; it must produce some "injury or harm." <u>Gilbert v. Des Moines Area Cmty. Coll.</u>, 495 F.3d 906, 917 (8th Cir. 2007). The Eighth Circuit has "concluded that commencing performance evaluations, or sending a critical letter that threatened 'appropriate disciplinary action,' or falsely reporting poor performance, or 'lack of mentoring and supervision' were actions that did not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee." <u>Littleton v. Pilot Travel Ctrs., LLC</u>, No. 08-1221, 2009 WL 1544436, *3, __ F.3d __ (8th Cir. June 4, 2009) (citing <u>Weger v. City of Ladue</u>, 500 F.3d 710, 727 (8th Cir. 2007); <u>Gilbert</u>, 495 F.3d at 917; <u>Devin v. Schwan's Home Serv., Inc.</u>, 491 F.3d 778, 786 (8th Cir. 2007); and <u>Higgins</u>, 481 F.3d at 590)).

To establish the second element of her prima facie case, plaintiff must do more than label her discipline and co-worker comments as retaliatory. Plaintiff has failed to demonstrate material injury or harmful impact on her employment, as she has not, for example, suffered a loss of pay or hours, had changes made to her responsibilities, or been excluded from training or mentorship available to other employees. See Littleton, 2009 WL 1544436, at *3. Nor has plaintiff demonstrated that the discipline or comments she complains of were likely to deter a worker from engaging in statutorily protected activity. After the incidents plaintiff cites as retaliation occurred, plaintiff personally filed a complaint in this court alleging discrimination.

Because plaintiff has not established the first or second elements of her prima facie case, the Court need not address the third element of the prima facie case, which is dependent on the first two elements. St. John's motion for summary judgment should be granted as to plaintiff's claim of retaliation under the ADA.

## Conclusion

For the foregoing reasons, the Court will grant defendant St. John's motion for summary judgment in all respects.

Plaintiff's "Memorandum for Clerk" filed March 31, 2009, which the Court construes as a motion to compel discovery responses, is denied for failure to comply with Eastern District Local Rule 3.04(A), which provides:

> The Court will not consider any motion relating to discovery and disclosure unless it contains a statement that movant's counsel has conferred in person or by telephone with the opposing counsel in good faith or has made reasonable efforts to do so, but that after sincere efforts to resolve their dispute, counsel are unable to reach an accord. This statement also shall recite the date, time and manner of such conference, and the names of the individuals participating therein, or shall state with specificity the efforts made to confer with opposing counsel.

E.D. Mo. L. R. 3.04(A).[10]

Accordingly,

**IT IS HEREBY ORDERED** that defendant St. John's Mercy Medical Center's motion for summary judgment is **GRANTED**. [Doc. 34]

**IT IS FURTHER ORDERED** that plaintiff's Memorandum for Clerk, construed as a motion to compel, is **DENIED**. [Doc. 36]

An appropriate judgment will accompany this memorandum and order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this __19th__ day of June, 2009.

---

[10]Moreover, the Court has reviewed plaintiff's request for production of documents, defendant's response thereto, and the briefing on the motion to compel. St. John's agreed to produce the first category of documents requested by plaintiff ("all electronic correspondence that refers to Plaintiff from 2006 to present). With respect to the second category of documents ("all records on the temporary ventilation system in unit 476"), St. John's responded that "no such documents exist inasmuch as there was no temporary ventilation system in ICU Unit 476." Def.'s Objs. and Responses to Pl.'s Reqs. for Prod. of Docs. at 2, ¶ 1.d.